UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

_____

| | | |
|---|---|---|
| SHANE K. ENSLIN, *on behalf of himself* *and all others similarly situated*, | : | |
| | : | |
| | : | |
| Plaintiff, | : | |
| v. | : | No. 2:14-cv-06476 |
| | : | |
| THE COCA-COLA COMPANY; | : | |
| COCA-COLA REFRESHMENTS USA, INC.; | : | |
| KEYSTONE COCA-COLA AND BOTTLING | : | |
| AND DISTRIBUTION CORPORATION; | : | |
| KEYSTONE COCA-COLA BOTTLING CO.; | : | |
| KEYSTONE COCA-COLA BOTTLING | : | |
| COMPANY, INC.; | : | |
| KEYSTONE COCA-COLA BOTTLING | : | |
| CORPORATION; | : | |
| THOMAS WILLIAM ROGERS, III; | : | |
| DOE DEFENDANTS 1-50; | : | |
| ABC CORPORATIONS 1-50; and | : | |
| XYZ PARTNERSHIPS AND ASSOCIATIONS, | : | |
| | : | |
| Defendants. | : | |

_____

# **O P I N I O N**

**Joseph F. Leeson, Jr.**                                              **March 31, 2017**
**United States District Judge**

## I.      Introduction

Shane Enslin is a former employee of The Coca-Cola Company.[1] Like many employees, Enslin provided Coca-Cola with various types of personal information during the hiring process, including his home address, telephone number, social security number, and driver's license number. In 2013—long after Enslin left the company—Coca-Cola discovered that one of its information technology employees had been taking home old laptop computers that were no longer in use, keeping some for himself and giving away others. After an investigation, Coca-Cola found that some of those computers still contained remnants of personal information relating to current and former Coca-Cola employees. Enslin was one of those employees.

---

[1]      Enslin was actually hired by an independent Coca-Cola bottler, which is now owned by a subsidiary of The Coca-Cola Company, but for convenience of reference, the various Coca-Cola defendants will be referred to simply as "Coca-Cola," except when distinctions between them are pertinent to this case.

A few months after Coca-Cola notified him and the other affected employees of the breach, he was the victim of fraud. Enslin blames Coca-Cola. He has sued the company and a number of its affiliates for breach of contract and unjust enrichment, claiming that Coca-Cola promised—either expressly or implicitly—to secure his personal information and did not hold up its end of the bargain. But in the Court's view, Coca-Cola owed him no such contractual duty.

## II.    Background

Enslin was hired in 1996 by Keystone Coca-Cola. At the time, Keystone Coca-Cola was an independent Coca-Cola bottler and distributor, and Enslin was hired as a technician to repair Coca-Cola equipment around the area, such as soda fountains and vending machines.

In the late 1980s and 1990s, many of Coca-Cola's independent bottlers were acquired by Coca-Cola Enterprises, Inc., an affiliate of the parent Coca-Cola Company. That time came for Keystone Coca-Cola in 2001. As part of the transition, Enslin was required to complete Coca-Cola Enterprises' employment paperwork, including a standard form employment application, which asked for his home address, telephone number, social security number, and driver's license number. That application also contained a certification that Enslin was required to sign, which stated, "If employed, I agree to follow the rules, regulations and other directives of the Company." Pl.'s Mot. Ex. A, at 0001102, ECF No. 168

The same day that Enslin completed the application, he also signed an acknowledgment that he had read the Coca-Cola Enterprises' handbook, titled the "Code of Business Conduct." During discovery in this case, neither side was able to locate a copy of the Code in effect on that date in 2001, but Coca-Cola produced a copy of the Code from the 1990s, which Enslin believes is "substantially similar" to the one he reviewed in 2001. Enslin Decl. ¶ 13, ECF No. 164. He relies on the contents of that Code to support his breach of contract claim, and for the purpose of this opinion, the Court will as well.

In addition to the Code, Coca-Cola Enterprises also maintained an extensive collection of policies related to the use of its information technology resources, including an overall acceptable use policy, an asset protection policy, and information classification standards, which relate to the handling of different types of confidential information.

Enslin left Coca-Cola Enterprises in 2007. The Coca-Cola Company later acquired the North American bottling operations that Coca-Cola Enterprises had accumulated, vertically integrating the bottlers with the parent company.

In 2013, Coca-Cola discovered that one of its information technology employees had been taking home older laptop computers that were no longer in use without permission. Some of those laptops he used himself; others were later found in the homes of some acquaintances. A few more he apparently gave away to settle a debt. After it learned of the breach, Coca-Cola sought to recover its missing hardware, and while it has "a very good feeling" that it has been able to recover it all, it cannot say for sure.[2] After examining the equipment it did recover, Coca-

---

[2]    Pl.'s Opp'n Ex. F, at 230:14-20, ECF No. 180-2.

Cola discovered that some of the laptops had previously been used by members of its human resources department and still contained personal information of some present and former employees. The company compiled a list of every employee whose personal information it found on those machines, sent a letter to each of them about the incident, and provided for them to each receive a year of free credit monitoring and fraud restoration services. In total, the laptops contained information tied to 74,000 different employees, including Enslin.

A few months after he received word of the breach, a number of accounts that Enslin and his spouse maintained with online retailers were compromised and used to make unauthorized purchases. As mentioned, Enslin has sued Coca-Cola and a number of its affiliates for breach of contract and unjust enrichment.[3] He claims certain provisions in the Code of Conduct and information technology policies, which deal with safeguarding sensitive information, show that Coca-Cola promised—either expressly or implicitly—to safeguard the personal information he provided on his 2001 Coca-Cola Enterprises employment application. He also seeks to represent a class of former and current Coca-Cola employees affected by the breach.

Before the Court are summary judgment motions from both sides. Enslin has filed a partial summary judgment motion, seeking to establish only that Coca-Cola owed him a contractual duty to secure his personal information. Coca-Cola, on the other hand, contends that a jury could not find for Enslin on either his breach of contract claim or his claim under the law of restitution, and it seeks the entry of judgment in its favor on both claims. Also pending is Enslin's motion for class certification. The summary judgment motions will be taken up first—in part because Coca-Cola's summary judgment motion raises a threshold challenge to the Court's subject matter jurisdiction.[4]

---

[3]     His complaint also contained claims for negligence, negligent misrepresentation, fraud, bailment, civil conspiracy, and violation of the Driver's Privacy Protection Act of 1994, 18 U.S.C. §§ 2721-25. Those claims were dismissed at the pleadings stage. *See Enslin v. Coca-Cola Co.*, 136 F. Supp. 3d 654 (E.D. Pa. 2015).

[4]     "[I]t is 'within the court's discretion to consider the merits of the claims before their amenability to class certification.'" *Kehoe v. Fid. Fed. Bank & Tr.*, 421 F.3d 1209, 1211 (11th Cir. 2005) (quoting *Telfair v. First Union Mortg. Corp.*, 216 F.3d 1333, 1343 (11th Cir. 2000)). Enslin wishes to have his motion for class certification taken up first, but at the outset of this case, the Court agreed to adopt his proposed schedule, which called for a single period of discovery into both the merits and issues related to class certification—with summary judgment motions due immediately after briefing was complete on his class certification motion—rather than a phased discovery plan that could have put class discovery and a decision on certification ahead of merits discovery and dispositive motions. *See* Rule 26(f) Report, at 4, ECF No. 33. In any event, there are "many valid reasons" that may justify delaying a certification decision, including the fact that a "party opposing [a] class may prefer to win dismissal or summary judgment as to the individual plaintiffs without certification and without binding the class that might have been certified," which is the case here. *See* Fed. R. Civ. P. 23(c)(1) advisory committee's note to 2003 amendment. For Coca-Cola, that raises the specter of having to "oppose the members of the class one by one" rather than having the chance to secure a binding decision against them all, but "[c]lass actions are expensive to defend," and "[o]ne way to try to knock one off at low cost is to seek summary judgment before the suit is certified as a class action." *Cowen v. Bank United of Tex., FSB*, 70 F.3d 937, 941-42 (7th Cir. 1995) (Posner, J.). Surely aware of that tradeoff, Coca-Cola has nonetheless urged the Court to address the summary judgment motions first.

**III.     Enslin's claims are not preempted by the Labor Management Relations Act nor subject to the requirement of exhaustion.**

During both his time at Keystone Coca-Cola and later at Coca-Cola Enterprises, Enslin was a member of the International Brotherhood of Teamsters. Initially, he was a member of Local Union Number 229 and later, after his job location moved from Mount Pocono, Pennsylvania, to Pittston, Pennsylvania, he became a member of Local Union Number 401. Both of those unions had collective bargaining agreements (CBAs) with Enslin's employers.[5] In Coca-Cola's view, Enslin's contention that Coca-Cola Enterprises formed a contract with him to safeguard his personal information is flatly inconsistent with the fact that his employment relationship was governed at all times by a CBA. At the least, the company contends that reconciling Enslin's claims with his status as a member of a collective bargaining unit will require an interpretation of one or both CBAs. Either way, Coca-Cola suggests that these considerations pose a problem for Enslin's claims because of the "extraordinary" preemptive force that the Labor Management Relations Act exerts over state-law claims that implicate CBAs. *See Caterpillar Inc. v. Williams*, 482 U.S. 386, 393-94 (1987) (quoting *Metropolitan Life Ins. Co. v. Taylor*, 481 U.S. 58, 65 (1987)).

At issue is § 301 of the Labor Management Relations Act, 29 U.S.C. § 185(a). On its face, § 301 simply grants the district courts jurisdiction to hear "[s]uits for violation of contracts between an employer and a labor organization," but § 301 has long been held to do far more than just grant the federal courts jurisdiction to hear disputes over labor contracts. The statute is understood to embody "a congressional mandate to the federal courts to fashion a body of federal common law to be used to address disputes arising out of labor contracts," *Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 209 (1985), motivated by concerns that if the interpretation of CBAs fell to an unpredictable mixture of state and federal law, "the process of negotiating an agreement would be made immeasurably more difficult by the necessity of trying to formulate contract provisions in such a way as to contain the same meaning under two or more systems of law which might someday be invoked in enforcing the contract." *Id.* at 210 (quoting *Teamsters v. Lucas Flour Co.*, 369 U.S. 95, 103 (1962)).

As a result, whenever a plaintiff brings a state-law claim whose resolution is "substantially dependent upon an analysis of a collective-bargaining agreement," § 301 preempts the claim. *Caterpillar*, 482 U.S. at 386 (quoting *Int'l Bhd. of Elec. Workers v. Hechler*, 481 U.S. 851, 859 n.3 (1987)). That does not mean that every claim that touches upon a CBA is preempted. The mere fact that a CBA may need to be consulted to resolve a state-law claim does

---

[5]     *See* Defs.' Mot. Ex. 3, 91:17-92:24 (Q: Were you, when you worked at Coke, a member of Teamsters Local Union 401? A: I always—I have to kind of broaden in that. When I first started, it was 229 . . . [a]nd when they moved facilities, I believe it became 401. . . . Q: In both periods of time, before the Pittston facility and after that move, were you a member of a union? A: Yes, sir. Q: And was any employment agreement you had with the company governed by a collective bargaining agreement? A: From what I am understanding of your question, yes, I was part of the union and they had their bargaining contract with the company. Q: And you, both before the Pittston facility and after, did not have an individual employment contract, correct? A: Correct.").

not lead to preemption, as long as the meaning of the applicable portion of the CBA is not in dispute. *See Livadas v. Bradshaw*, 512 U.S. 107, 124 (1994). Nor is preemption warranted if a dispute over the meaning of a CBA is introduced into the case by a defendant's defense, rather than by the elements of the plaintiff's state-law claim. *Caterpillar*, 482 U.S. at 399 (recognizing that "a defendant cannot, merely by injecting a federal question into an action that asserts what is plainly a state-law claim, transform the action into one arising under federal law"). Section 301's preemptive force is broad, but "not every dispute concerning employment, or tangentially involving a provision of a collective-bargaining agreement, is pre-empted by § 301." *Allis-Chalmers*, 471 U.S. at 211.

Before applying these principles to Enslin's claims, it is important to note what preemption would mean under these circumstances. When a plaintiff's claim is preempted by § 301, that does not mean that the plaintiff is necessarily barred from recovering. "Preemption" in this context does not refer to the ordinary notion of "conflict" or "defensive" preemption, where a law with preemptive force extinguishes a plaintiff's right of recovery. Rather, when a state-law claim is preempted by § 301, the claim is simply transformed into a federal cause of action, to be governed by a uniform body of federal common law. Under this type of preemption, referred to as complete preemption, "any claim purportedly based on [a] pre-empted state law is considered, from its inception, a federal claim." *Caterpillar*, 482 U.S. at 393; *see Allis-Chalmers*, 471 U.S. at 220-21 (recognizing that if a state-law claim is preempted by § 301, it may simply "be treated as a § 301 claim").

Since § 301 preemption would not do away with Enslin's right to recover but rather just transform his state-law claims into federal claims (to be governed by federal common law), the possibility that they may be § 301 preempted does not, in and of itself, necessarily pose a problem for him. The problem is that if his claims do depend upon an interpretation of a CBA, he may have needed to exhaust those claims through a grievance procedure before filing this suit.

Both of the CBAs that applied to Enslin—the agreement with Local 229 and the agreement with Local 401—contain mandatory grievance procedures that a union member must follow, and their scope is broad. The language in both agreements is nearly identical: under the Local 401 agreement, a union member must grieve any "dispute over the interpretation or application of an article or section of this Agreement," Defs.' Mot. Ex. 5, at 12, and under the Local 229 agreement, a union member must grieve any "dispute over the interpretation or application of a specific article or section of this Agreement," Defs.' Mot. Exs. 18., at 21. That language closely tracks the broad standard for preemption under § 301—both turn on whether a dispute is presented over the interpretation of a CBA—so if Enslin's claims are preempted by § 301, that also would likely trigger the mandatory grievance procedures in the CBAs.

When a CBA contains a dispute resolution procedure, that procedure must be exhausted "before filing a complaint in federal court 'unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.'" *Angst v. Mack Trucks, Inc.*, 969 F.2d 1530, 1537 (3d Cir. 1992) (quoting *United Steelworkers of Am. v.*

*Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582-83 (1960)). Hoping to cover his bases, Enslin sent a letter to Local 401 on December 29, 2016—a week after he received Coca-Cola's summary judgment motion—attempting to invoke the grievance procedures. The union's officer responded by letter a few days later, informing him that the union would not pursue his grievance. The letter pointed out that "no contact [had] been made with the Local until now"— more than two years after Enslin filed his federal suit—which meant that "any claim of a grievance is untimely." Pl.'s Opp'n Ex. Q. That was likely a reference to the fact that the grievance procedures in the Local 401 CBA require all claims to be raised within five business days.

Enslin contends that the union's decision not to pursue his grievance satisfies his obligation to exhaust the grievance procedures, but that is not so. Just as a failure to utilize available grievance procedures bars a union member from seeking relief in court, so too does a failure "to invoke them in a timely manner." *Carr v. Pac. Mar. Ass'n*, 904 F.2d 1313, 1317 (9th Cir. 1990) (Kozinski, J.) (citing *Republic Steel Corp. v. Maddox*, 379 U.S. 650, 652 (1965)); *see Wiggins v. Heinz N. Am.*, 243 F. App'x 663, 664 (3d Cir. 2007) (explaining that a union member whose grievance was filed untimely under the CBA failed to exhaust his claim). If this were not the case, Enslin could sidestep the grievance process by simply ignoring it. *See Allis-Chalmers*, 471 U.S. at 220.

Thus, the question remains whether Enslin's claims fall within the scope of the grievance procedures under the CBAs. If they do, his claims are likely barred.[6] If they do not, they can proceed here. In the Court's view, his claims are neither subject to § 301 preemption nor within the scope of the grievance procedures because they do not substantially depend upon an interpretation of either CBA.

Coca-Cola's primary contention is that Enslin's claims cannot be resolved without analyzing the CBAs because both agreements contain exclusivity provisions that restrict the ability of the Coca-Cola entities and the union members to enter into side agreements outside of the collective bargaining process. Once again, the two agreements contain quite similar language. The Local 229 agreement—which governed Enslin's employment relationship in 2001, when he claims that a contract was formed to safeguard his personal information[7]— provides that "[n]o employee shall be asked to make any written or verbal Agreement which may in any way conflict with the terms of this Agreement." Defs.' Mot. Ex. 18, at 23. Similarly, the Local 401 agreement, which governed the latter part of Enslin's time as a Coca-Cola employee, provides that "[t]he Employer agrees not to enter into any agreement or contract with his

---

[6]     There are a few narrow exceptions to the exhaustion requirement, but none would appear to apply. *See Vaca v. Sipes*, 386 U.S. 171, 185-86 (1967).

[7]     Enslin explained that he transitioned from Local 229 to Local 401 when his job moved from a facility in Mount Pocono, Pennsylvania, to a facility in Pittston, Pennsylvania. *See supra* note 5. The employment application he filled out in 2001 (when Coca-Cola Enterprises purchased his employer, Keystone Coca-Cola), which Enslin claims to be the genesis of the contract that Coca-Cola allegedly breached, states that he was applying for a job at the Mount Pocono location at that time. *See* Pl.'s Mot. Ex. A, at 0001101.

employees, individually or collectively, which in any way conflicts with the terms and provisions of this Agreement without the knowledge and consent of the Local Union." Defs.' Mot. Ex. 5, at 27.

There is no need to interpret either of those provisions to assess the viability of Enslin's claims. Coca-Cola concedes that neither CBA contains any terms that relate to the safeguarding of personal information, so if Coca-Cola did form an independent agreement with Enslin on that topic, that agreement would not "in any way conflict with the terms" of either one. Since it is plain that the exclusivity provisions in the CBAs would not be an impediment to the contract that Enslin claims he formed with Coca-Cola, there is no need to "interpret" those provisions to see that there is no conflict between them and the contract Enslin claims to have. As the Seventh Circuit explained,

> merely examining [a] collective bargaining agreement to determine whether a conflict actually exists [with an alleged side agreement] is not "interpreting" the collective bargaining agreement . . . . "If it were, the section 301 pre-emption doctrine would swallow the rule that employees covered by collective bargaining agreements are entitled 'to assert legal rights independent of that agreement, including state-law contract rights, so long as the contract relied upon is not a collective-bargaining agreement.'"

*Loewen Grp. Int'l, Inc. v. Haberichter*, 65 F.3d 1417, 1423 (7th Cir. 1995) (citation omitted) (quoting *Milne Emps. Ass'n v. Sun Carriers*, 960 F.2d 1401, 1409-10 (9th Cir. 1995)); *see also Kline v. Sec. Guards, Inc.*, 386 F.3d 246, 256 (3d Cir. 2004) ("[T]he mere fact that we must look at the CBA in order to determine that it is silent on any issue relevant to Appellant's state claims does not mean that we have 'interpreted' the CBA.").

More difficult for Enslin is a substitution clause in the CBA for Local 401, which took effect in March 2004—after the time that he claims Coca-Cola formed a contract with him to safeguard his personal information. That CBA provides that as of the date it took effect, it was intended to "represent[] the complete Agreement between the parties," and "[a]ny previous written or verbal agreement shall be deemed to be superseded by the terms and conditions of this Agreement." Defs.' Ex. 5, at 27. Reconciling that provision with Enslin's contention that he has an independent agreement with Coca-Cola that was formed in 2001 is a more difficult problem— one that cannot be resolved with just a "mere glance" at the CBA. *See In re Bentz Metal Prods.*, 253 F.3d 283, 289 (7th Cir. 2001) (en banc).

But this interpretive question arises only as part of Coca-Cola's defense to Enslin's claims, not as part of Enslin's case-in-chief. Whether a later contract, like the Local 401 CBA, may have superseded an earlier agreement is for Coca-Cola to show, because "[t]he party asserting a novation or substituted contract has the burden of proving that the parties intended to discharge the earlier contract." *Buttonwood Farms, Inc. v. Carson*, 478 A.2d 484, 486 (Pa. Super. Ct. 1984); *see* 6 Arthur Linton Corbin, *Corbin on Contracts* § 1293 (1962) ("No one will

be held to have surrendered or modified any of his contract rights unless he is shown to have assented thereto in a manner that satisfies the requirements of a valid contract."). As previously mentioned, an interpretive question raised only through a defendant's defense does not trigger § 301 preemption. *See Caterpillar*, 482 U.S. at 399 (explaining that "a defendant cannot, merely by injecting a federal question into an action . . . , transform the action into one arising under federal law"). Nor does it suffice to bring Enslin's claims into the scope of the mandatory grievance procedures because it does not alter the fact that Enslin's claims are concerned with the existence of an agreement independent of the CBA, not a "dispute over the interpretation or application" of a section or article of the CBA. *See id.* at 399 n.15 ("Caterpillar contends that the Court of Appeals' decision offends the paramount national labor policy of referring disputes to arbitration . . . . This argument presumes that respondents' claims are arbitrable, when, in fact, they are alleged to grow out of individual employment contracts to which the grievance-arbitration procedures in the collective-bargaining agreement have no application."). *But see Cavallaro v. UMass Mem'l Healthcare, Inc.*, 678 F.3d 1, 7 (1st Cir. 2012) (concluding that the interpretive dispute that would inevitably arise from an employer's claim that a later CBA superseded earlier, independent contracts was sufficient to require the union members to seek redress through the CBA's dispute resolution procedures).

Finally, Coca-Cola suggests that because both CBAs expressly permitted Coca-Cola Enterprises to "establish reasonable rules, programs and policies,"[8] Enslin's reliance on the Coca-Cola Enterprises' Code of Conduct and information technology policies to support his claims is a sufficient nexus to the CBAs to bring his claims within the scope of § 301 and the mandatory grievance procedures. But the mere fact that the CBAs recognized Coca-Cola Enterprises' authority to establish the rules, programs, and policies that Enslin relies upon does not mean that his claims are "founded directly on rights created by collective-bargaining agreements" or "substantially dependent on an analysis of a collective-bargaining agreement." *See id.* at 394 (quoting *Hechler*, 481 U.S. at 859 n.3).

For these reasons, Enslin's claims are neither preempted by § 301 nor subject to the grievance procedures in the CBAs. Accordingly, the Court turns to the merits of the parties' summary judgment motions.

## IV.   Coca-Cola was not contractually obligated to safeguard Enslin's personal information.

### A.   *Standard of Review*

Summary judgment is appropriate if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if the fact "might affect the outcome of the suit under the governing law," and a dispute is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248

---

[8]      Defs.' Mot. Ex. 18, at 4; Defs.' Mot. Ex. 5, at 23.

(1986). When the evidence favoring the nonmoving party is "merely colorable" or "not significantly probative, summary judgment may be granted." *Id.* at 249-50 (citations omitted). The parties must support their respective contentions—that a fact cannot be or is genuinely disputed—by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute." Fed. R. Civ. P. 56(c)(1).

The primary point of contention in this case is whether one of the Coca-Cola entities formed a contract—express or implied—with Enslin to safeguard the personal information he provided on his 2001 employment application. Under Pennsylvania law, if "the facts are in dispute, the question of whether a contract was formed is for the jury to decide," *Ingrassia Const. Co. v. Walsh*, 486 A.2d 478, 482 (Pa. Super. Ct. 1984), but [t]he question of whether an undisputed set of facts establishes a contract is a matter of law," *Mountain Properties., Inc. v. Tyler Hill Realty Corp.*, 767 A.2d 1096, 1101 (Pa. Super. Ct. 2001). *See also Reitmyer v. Coxe Bros. & Co.*, 107 A. 739, 741 (Pa. 1919) ("Whether from the facts and circumstances shown an implied . . . contract could be derived was a question of law, and should have been passed upon by the court."). In this case, the parties largely agree on the facts that bear on the question of whether a contract was formed—and if so, what it meant—which makes those questions ripe for disposition as a matter of law. *See* Fed. R. Civ. P. 56(a).[9]

## B.   *A portion of the Coca-Cola Enterprises' Code of Conduct is enforceable against the company.*

The main thrust of Enslin's claims is that in 2001, Coca-Cola expressly formed a contract with him to safeguard his personal information when he submitted an employment application to Coca-Cola Enterprises, following the acquisition of his original employer, Keystone Coca-Cola. Enslin says that the terms of this agreement are "codified in three overlapping documents:"[10]

---

[9]    At times in their briefing, both sides suggest that some relevant facts are in dispute, but the evidence the parties have submitted reveals no genuine dispute. In its briefing, Coca-Cola contends that Enslin has not provided any proof that he ever received a copy of Coca-Cola Enterprises' Code of Conduct in 2001 (when he submitted his employment application), which Enslin relies upon heavily to support his breach of contract claims. But Enslin submitted a signed "Acknowledgment" slip from his personnel file, dated the same day as his employment application, which states that by signing the slip of paper, Enslin was affirming that he had read the Code of Conduct. *See* Pl.'s Mot. Ex. A, at 0001103. Notably, the bottom of that slip contains printed text directing the signer to "please tear off and return this card to your local Human Resources Manager," and a copy of the Code of Conduct that Coca-Cola located and produced during discovery contains an identical slip of paper (not filled out), attached to the last page of the Code. It is quite clear, then, that Enslin had a copy of the Code of Conduct—at one time attached to the slip that he signed—in his possession in 2001.

Enslin, for his part, contends that Coca-Cola has not established that he was subject to either the Local 229 or Local 401 CBAs, which pose a threat to his claim that he formed an independent contract with Coca-Cola during that time. But Enslin testified, unequivocally, that he was a member of a union during his entire time with Coca-Cola—first with Local 229, then with Local 401, *see supra* note 5—and Coca-Cola has produced copies of the CBAs with both of those unions that covered the two facilities where Enslin worked, *see* Defs.' Mot. Exs. 5, 18. There is no genuine dispute over these facts.

[10]    Pl.'s Opp'n 8, ECF No. 180.

First, the employment application itself, which contained the following preprinted certification:

> If employed, I agree to follow the rules, regulations and other directives of the Company. However, I understand that my employment can be terminated, with or without cause, and with or without notice, at any time, at the option of either the Company or myself. I understand that no Company representative other than the President, has any authority to enter into any agreement to employ me for a specific period of time, or to make any agreement contrary to the foregoing. . . . I acknowledge that no other representations have been made to me as of this date concerning employment by the Company. I have carefully read and understood the above, and hereby consent and agree to these conditions in exchange for the Company's consideration of my application for employment.

Pl.'s Mot. Ex. A, at 0001102, ECF No. 168.

Second, the Coca-Cola Enterprises Code of Conduct. During discovery, neither side was able to locate a copy of the Code in effect in 2001, but Coca-Cola produced a copy of the Code from the 1990s, which Enslin believes is "substantially similar" to the one he reviewed in 2001. Enslin Decl. ¶ 13, ECF No. 164. Coca-Cola has produced no evidence to the contrary, and for the purposes of this opinion, the Court will assume that the copy that has been produced accurately captures the terms of the Code from 2001.[11]

The Code is divided into two main sections, the first titled "Coca-Cola Enterprises' Responsibilities to Employees," and the second titled, "Your Responsibilities." Enslin points to two passages in particular. The first, located in the "Coca-Cola Enterprises' Responsibilities to Employees" section and appearing below the heading, "Employee Records," reads as follows:

> The Company will safeguard the confidentiality of employee records by advising employees of all personnel files maintained on them, collecting only data related to the purpose for which the files were established and allowing those authorized to use a file to do so only for legitimate Company purposes. Employees will be allowed to inspect (and challenge for correction as necessary) information in their personnel files, other than confidential letters of recommendation, material relating to other employees, investigatory materials and audit material, unless otherwise provided under applicable law. The Company will comply with all applicable laws relating to employee records and personnel files.

---

[11] This evidentiary gap could call into question Enslin's ability to prove the terms of the contract he claims he had, *McShea v. City of Phila.*, 995 A.2d 334, 340 (Pa. 2010) (recognizing that it is the plaintiff's burden to prove "the existence of a contract, including its essential terms"), but because the Court concludes that Enslin cannot prevail even under this version of the Code, the result would be no different.

Defs.' Mot. Ex. 10, at 0017662. The second passage, located in the section of the Code titled "Your Responsibilities" and appearing below the heading, "Safeguarding Company Assets," reads in relevant part as follows:

> We all have an obligation to safeguard Company assets including exercising care in using Company equipment and vehicles, and bringing to the attention of higher management any waste, misuse, destruction or theft of Company property or any improper or illegal activity. . . .
>
> Computer hardware, software, and data must be safeguarded from damage, alteration, theft, fraudulent manipulation, and unauthorized access to and disclosure of Company information.
>
> Employees must adhere to specific security measures and internal controls for each computer system to which they are authorized access, and should avoid any personal use of Company-owned computer hardware or software.

*Id.* at 0017669-70.

Third, Enslin points to two detailed information technology policies—the Information Protection Policy and the Acceptable Use Policy. The purpose of the Information Protection Policy is to provide specific guidance on "protecting information, whether electronic, hard copy, or verbal" in view of the fact that "all Employees and Third Parties share in the responsibility of safeguarding the information used to support our business operations." Defs.' Mot. Ex. 9, at 0000666. The purpose of the Acceptable Use Policy is to "define[] the appropriate use of Company Information and Systems by Users," and to that end, the Policy advises that "[i]t is each User's responsibility and obligation to ensure that Systems are used properly." *Id.* at 0000744.

Enslin contends that, when woven together, these documents create an express obligation on Coca-Cola's part to safeguard his personal information. He reasons that the terms in the Code of Conduct and the information security policies define the terms under which Coca-Cola was obligated to obtain, store, and use his personal information, while the certification on the employment application—which stated that by submitting the application, Enslin was binding himself to "follow the rules, regulations and other directives of the Company"—evidences that both Enslin and Coca-Cola intended for the Code of Conduct and the information security policies to be treated as binding contractual obligations.

The threshold question is whether these documents—or any part of them—amount to a contract. This case is one of many "handbook" cases, where an employee claims that terms in an employee handbook, code of conduct, or workplace policy are a source of binding contractual obligations. As a general matter, "[a] handbook distributed to employees as inducement for employment may be an offer and its acceptance a contract." *Morosetti v. La. Land & Expl. Co.,*

564 A.2d 151, 152 (Pa. 1989).[12] But that basic premise is of little help in determining in a particular case whether particular provisions in documents like these are contractually binding.

Enslin focuses on the fact that the company required him, in no uncertain terms, to comply with the company's rules, regulations, and policies as a condition of his employment. In his view, that suggests that all of the rules, regulations, and policies the company promulgated were intended to be binding on both sides. But that argument misses the mark. He is of course correct that under the terms of the employment application and the two CBAs, he was obligated to follow the company's rules. The certification he signed on his employment application stated, "[i]f employed, I agree to follow the rules, regulations and other directives of the Company,"[13] and under both CBAs, the company had the right "to maintain order and efficiency" and "establish reasonable rules, programs and policies," which expressly included things like rules of personal conduct, attendance control programs, drug and alcohol testing, and safety rules.[14] But those provisions simply stand for the unremarkable proposition that Enslin was obligated to follow the company's rules. None of those provisions suggest that the company intended to make any binding commitments to Enslin, so they shed no light on whether the provisions in the Code of Conduct or the information technology policies impose any contractual obligations on the company.

Instead, the proper inquiry in handbook cases like these takes essentially the same form as an ordinary formation inquiry in a contract case: does the writing evidence intent by both sides to be bound by the promise in question? As one Pennsylvania court explained, "[a] handbook is enforceable against an employer if a reasonable person in the employee's position would interpret its provisions as evidencing the employer's intent to . . . be bound legally by its representations in the handbook." *Bauer v. Pottsville Area Emergency Med. Servs., Inc.*, 758 A.2d 1265, 1269 (Pa. Super. Ct. 2000) (quoting *Luteran v. Loral Fairchild Corp.*, 688 A.2d 211, 214-15 (Pa. Super. Ct. 1997)); *cf. Mountain Properties*, 767 A.2d at 1101 (explaining, in an ordinary contract case, that "[w]hether particular conduct expresses an offer and acceptance must be determined on the basis of what a reasonable person in the position of the parties would be led to understand by such conduct under all of the surrounding circumstances"). That said, the Pennsylvania courts approach handbooks and other employment documents with a bit more skepticism than contracts in other contexts, *see Luteran*, 688 A.2d at 215 (cautioning that a court

---

[12]   As a concurring justice pointed out, *Morosetti* concerned a dispute over the contractual enforceability of an informal workplace policy related to severance pay, not terms in a handbook, so this statement was only dicta. 564 A.2d at 153 (Zappala, J., concurring). He also pointed out that "the issue of the effect of the distribution of an employee handbook" was an open question before the court, *id.*, and it does not appear that the Pennsylvania Supreme Court has yet returned to the topic. But in that void, the intermediate Pennsylvania courts have fleshed out a fairly well-developed framework in this area, which has been relied upon by other courts tasked with construing Pennsylvania law. *See, e.g.*, *Scott v. Educ. Mgmt. Corp.*, 662 F. App'x 126, 131 n.7 (3d Cir. 2016); (citing a Pennsylvania Superior Court decision for the principle that terms in a handbook can constitute a binding contract); *McElroy v. Sands Casino*, 593 F. App'x 113, 117 (3d Cir. 2014) (same); *Garcia v. Matthews*, 66 F. App'x 339, 342 (3d Cir. 2003) (same).

[13]   Pl.'s Mot. Ex. A, at 0001102

[14]   Defs.' Mot. Ex. 18, at 4; Defs.' Mot. Ex. 5, at 23.

"should neither presume that the employer intended to be bound legally by distributing the handbook nor that the employee believed that the handbook was a legally binding instrument."), though that skepticism tends to be reserved for cases where an employee attempts to use a handbook to transform an at-will relationship into a tenured position, rather than cases when an employee simply seeks recognition for some other type of contractual right. *Compare Luteran*, 688 A.2d at 215, *Ruzicki v. Catholic Cemeteries Ass'n of Diocese of Pittsburgh*, 610 A.2d 495 (Pa. Super. Ct. 1992), *and Rutherfoord v. Presbyterian-Univ. Hosp.*, 612 A.2d 500, 501 (Pa. Super. Ct. 1992) (each declining to rely on handbooks and other policies to restrict an employer's power to terminate employees at-will), *with Bauer*, 758 A.2d 1265 *and Braun v. Wal-Mart Stores, Inc.*, 24 A.3d 875 (Pa. Super. Ct. 2014) (per curiam) (relying on handbooks to find enforceable rights to other types of benefits, like health insurance and rest breaks).

Ultimately, "it is for the court to interpret the handbook to discern whether it contains evidence of the employer's intention to be bound legally." *Bauer*, 758 A.2d at 1269 (quoting *Luteran*, 688 A.2d at 214-15).

Under this standard, the "Employee Records" section of the Code of Conduct, which provides that Coca-Cola Enterprises "will safeguard the confidentiality of employee records by advising employees of all personnel files maintained on them, collecting only data related to the purpose for which the files were established and allowing those authorized to use a file to do so only for legitimate Company purposes," and which gives employees the right to "inspect (and challenge for correction as necessary) information in their personnel files" is a binding contractual obligation. A reasonable employee would believe that the company committed itself to abide by these rules; they are not the sort of "aspirational statement[s]" or vague expressions of company policy that often fill company handbooks with no intent that they be given contractual significance. *See Martin v. Capital Cities Media, Inc.*, 511 A.2d 830, 838-39 (Pa. Super. Ct. 1986). If, for example, Coca-Cola's employees discovered that the company had used information from their personnel files for non-business purposes, they would rightfully believe that the company had breached its obligations and would rightfully expect the company to remedy any damages they may have suffered. The fact that this provision appears in the section of the Code of Conduct titled "Coca-Cola Enterprises' Responsibilities to Employees"—and not, say, the first section of the Code, titled "Our Values"—reinforces the conclusion that the company intended to bind itself to these promises.

Coca-Cola argues that no part of the Code of Conduct could amount to a binding contract because the company could modify it at any time, but that is not the case. The fact that Coca-Cola Enterprises in effect retained a unilateral right to revoke or modify any provision in the Code does not mean that those provisions could not be binding on the company while they were still in effect. *See, e.g.*, *Asmus v. Pac. Bell*, 999 P.2d 71, 79 (Cal. 2000) (en banc) ("As long as the [employer's policy] remained in force, . . . the promise was not optional with the employer and was fully enforceable until terminated or modified."); *see also Martin*, 511 A.2d at 839 (viewing an employer's ability to unilaterally alter a handbook as "lend[ing] support" to the

court's conclusion in that case that a term in the handbook was not binding, but not suggesting that fact was dispositive); *Luteran*, 688 A.2d at 372 (same).

That still leaves the question of whether either of Enslin's CBAs are an impediment to finding this part of the Code of Conduct to be enforceable. But as already explained, both the Local 229 CBA—which was in effect in 2001, when Enslin received the Code of Conduct—and the Local 401 CBA—which took effect in 2004, during the latter part of Enslin's employment—did not forbid the company from entering into independent agreements with union members as long as those agreements did not "in any way conflict[] with the terms and provisions of" the CBAs. Defs.' Mot. Ex. 5, 27; Defs.' Mot. Ex. 18, at 23. Indeed, the fact that each CBA did not forbid all independent contracts but only those that conflicted its terms suggests that the company and the unions contemplated the possibility that the company could form independent agreements pertaining to matters outside of the CBAs' scope. *Cf. Milione v. Hahnemann Univ.*, No. 89-6761, 1990 WL 73039, at *4 (E.D. Pa. May 29, 1990) (concluding that an independent agreement was not compatible with a CBA that stated, categorically, that "[t]here shall be no individual agreements between employee and [the company]").

As mentioned, the more difficult question is whether the substitution clause in the 2004 Local 401 CBA—which provides that "[a]ny previous written or verbal agreement shall be deemed to be superseded by the terms and conditions of this Agreement"—had the effect of eliminating any contract that might have been formed before it, including any agreement stemming from the Code of Conduct Enslin received in 2001. But a later contract will only extinguish an earlier one if the parties intended for the later contract to have that effect, and courts are reluctant to conclude that a later contract supplanted an earlier one if they do not cover the same subject matter. *See, e.g.*, *Buttonwood*, 478 A.2d at 487 (pointing out that a later contract did not address many of the essential terms of an earlier agreement).

This provision also must be read in context. In appears in Article 27 of the CBA, titled "Other Agreements," which reads in its entirety as follows:

Article 27

Other Agreements

27.1. The Employer agrees not to enter into any agreement or contract with his employees, individually or collectively, which in any conflicts with the terms and provisions of this Agreement without the knowledge and consent of the Local Union. Any such agreement shall be null and void.

27.2. This Agreement represents the complete Agreement between the parties. *Any previous written or verbal agreement shall be deemed to be superseded by the terms and conditions of this Agreement.*

Defs. Mot. Ex. 5, at 27 (emphasis added). When the substitution clause is read together with the rest of this Article, it reinforces the notion that the CBA was intended to supersede only previous

14

agreements pertaining to the same subject matter.  First, the substitution clause is coupled to an integration clause, and it is well-understood that integration clauses—which attempt to trigger the application of the parol evidence rule to bar later reliance on extrinsic evidence to inform the meaning of the contract—extend only to extrinsic evidence "involving the same subject matter as the contract." *Yocca v. Pittsburgh Steelers Sports, Inc.*, 854 A.2d 425, 436-37 (Pa. Super. Ct. 2004). Second, the substitution provision is joined in this Article by the previously-discussed exclusivity provision, which expressly leaves room for the company and the union members to enter into agreements outside of the CBA that do not conflict with the terms of the CBA. Given that the parties did not intend to bar side agreements dealing with other subjects, it would be peculiar to believe that they intended for this agreement to wipe away any agreements on other subjects that may have already been in place.

**C.**     ***Coca-Cola did not owe Enslin a general contractual duty to safeguard his personal information.***

Concluding that the "Employee Records" provision in the Code of Conduct is enforceable is only the first step. There still remains the question of whether this provision imposed a duty on Coca-Cola Enterprises (or any other Coca-Cola entity) to safeguard Enslin's information. And it is here that Enslin's argument falters.

First, it is necessary to understand the nature of the contractual duty that Enslin contends that the company undertook to safeguard his personal information. He claims that the company assumed a duty to him to ensure that its employees complied with their obligations under the aforementioned section of the Code titled "Safeguarding Company Assets," which advises employees that "[c]omputer hardware, software, and data must be safeguarded from damage, alteration, theft, fraudulent manipulation, and unauthorized access to and disclosure of company information." He contends that as part of that duty, the company was obligated to ensure that its employees adhered to the detailed information technology policies that the company promulgated, which directed employees to follow certain procedures when handling and storing the company's confidential information, such as ensuring that any electronic storage devices containing confidential information are encrypted. *See* Pl.'s Br. 5-6 (arguing that Coca-Cola Enterprises "did not hold up its end of the bargain by effectively implementing its information security policies"); Pl.'s Br. Opp'n 26, ECF No. 180 ("Plaintiff contends Coke breached its duty to protect Mr. Enslin's employee [information] by failing to follow the express provisions of its Code, its [Information Protection Policy] and its Acceptable Use Policy . . . ."); *id.* at 31("Coke promised to safeguard the personal information of their employees. They established policies to safeguard the data of their employees. They required their employees to be aware of these policies, and to agree to be bound by them. However, Coke failed to ensure that their policies were followed."). In Enslin's view, had the company followed its own information technology

policies, it would not have been possible for anyone to access the personal information on those laptops or remove them from the building.[15]

The express language of the Employee Records provision in the Code does not go nearly that far. Under that provision, the company agreed to assume three specific duties to its employees: to "advis[e] employees of all personnel files maintained on them, collect[] only data related to the purpose for which the files were established," and "allow[] those authorized to use a file to do so only for legitimate Company purposes." The fact that the Code carefully limits the scope of the company's responsibilities to these specific duties belies the notion that the company intended to take on a sweeping contractual duty to take various measures to safeguard its employees' information.

Nor does the "Safeguarding Company Assets" provision that appears later in the Code lend Enslin support. It is clear that this provision, which is situated in the section of the Code titled "Your Responsibilities," pertains to duties that the employees owed to the company, not duties that the company owed to them. This part of the Code obligates employees to "exercis[e] care in using Company equipment and vehicles" and "bring[] to the attention of higher management any waste, misuse, destruction or theft of Company property or any improper or illegal activity." It warns that "[c]omputer hardware, software, and data must be safeguarded from damage, alteration, theft, fraudulent manipulation, and unauthorized access to and disclosure of Company information" and requires "[e]mployees [to] adhere to specific security measures and internal controls for each computer system to which they are authorized access." These are rules that employees were required to follow for the company's good—they were not put in place for the benefit of the employees. The same is true with respect to the detailed information technology policies the company promulgated, which "define[] the appropriate use of Company Information and Systems by Users" and warn that "[i]t is each User's responsibility and obligation to ensure that Systems are used properly."

Enslin suggests that if an express duty to safeguard his information cannot be found in the words of the Code and the policies, one can be implied. But "[t]he law will not imply a different contract than that which the parties have expressly adopted," and "[t]o imply covenants on matters specifically addressed in the contract itself would violate this doctrine." *Hutchison v. Sunbeam Coal Corp.*, 519 A.2d 385, 388 (Pa. 1986). Attributing to Coca-Cola Enterprises the sort of duty that Enslin seeks to impose would disturb the carefully limited set of duties that the company was willing to assume.

Aside from the damage that Enslin's proposed interpretation would do to the clear language of the Code, it is axiomatic that a term will be implied into an agreement only when "absolutely necessary to effectuate [the] intent of [the] parties." *Id.* (citing 11 Walter H.E. Jaeger, *Williston on Contracts* § 1295 (3d ed. 1968)). There are times when a written contract "may be 'instinct with obligation,'" just "imperfectly expressed," *see Wood v. Lucy, Lady Duff-Gordon*,

---

[15]     Because the Court concludes that Enslin cannot establish that Coca-Cola owed him these contractual duties, the Court does not reach the question of whether a jury could conclude that the company had breached them.

118 N.E. 214, 214 (N.Y. 1917) (Cardozo, J.), and under those circumstances—when it is "apparent that an obligation is within the contemplation of the parties at the time of contracting"—contract law has no trouble imposing the duty. *See Amerikohl Mining, Inc. v. Mount Pleasant Twp.*, 727 A.2d 1179, 1184 (Pa. Commw. Ct. 1999); *Lady Duff-Gordon*, 118 N.E. at 214 ("The law has outgrown its primitive stage of formalism when the precise word was the sovereign talisman, and every slip was fatal."). But it is clear that imposing a duty Enslin seeks to impose was not within the range of their contemplation. *See Longenecker-Wells v. BeneCard Servs., Inc.*, No. 1:15-CV-00422, 2015 WL 5576753, at *7 (M.D. Pa. Sept. 22, 2015) (declining to conclude that an employer had contractually obligated itself to use "adequate" measures to protect its employees' private information in part because "it is implausible that [a company] would ever agree to allow others to bring private actions against [it] for data breaches committed by unknown third parties"), *aff'd*, 658 F. App'x 659 (3d Cir. 2016).

**D.**      *Coca-Cola did not form an implied contract with Enslin to safeguard his personal information.*

    In the alternative, Enslin also claims that Coca-Cola Enterprises formed an implied contract with him to safeguard his personal information. But having concluded that the extent of the company's obligations to safeguard his information are clearly laid out (and clearly limited) in the Employee Records provision in the Code of Conduct, there is no room to imply the existence of some other agreement to a different effect. *See Baer v. Chase*, 392 F.3d 609, 616–17 (3d Cir. 2004) ("There cannot be an implied-in-fact contract if there is an express contract that covers the same subject matter.").

    But even if the Employee Records provision in the Code did not amount to an express contract, clearing the way for an implied contract to possibly have arisen, one could not be found under these circumstances. Implied contracts arise "under circumstances which, according to the ordinary course of dealing and the common understanding of men, show a mutual intention to contract." *Hertzog v. Hertzog*, 29 Pa. 465, 468 (1857). Thus, if a relationship between two parties can be explained only by the understanding that they are acting contractually, the law will imply one. *Id.* ("The law ordinarily presumes or implies a contract whenever this is necessary to account for . . . relations found to have existed between the parties."). The question that must be answered, then, is whether the existence of a contract can be "inferred from their acts in the light of the surrounding circumstances." *Cameron v. Eynon*, 3 A.2d 423, 424 (Pa. 1939).

    In some contexts, such as banking and commerce, it may readily be seen that an obligation on the part of the bank or merchant to use reasonable measures to safeguard a customer's sensitive information is part of the bargain. *See, e.g.*, *Anderson v. Hannaford Bros. Co.*, 659 F.3d 151, 159 (1st Cir. 2011) (suggesting that an implied contract could arise between a merchant and its customers that the merchant "would take reasonable measures to protect the [customer's credit card] information"); *McGuire v. Shubert*, 722 A.2d 1087, 1090 (Pa. Super. Ct. 1998) ("Based on common law principles of contract and agency, a number of jurisdictions have

held that a bank has an implied contractual duty, as a matter of law, to keep financial information concerning a depositor confidential."). But the same cannot be said when an employee provides personal information to an employer as part of the hiring process. The "common understanding" of employers and employees is not that a contract arises at that moment that obligates the employer to use certain measures to safeguard the employees' information—the sufficiency of which can be tested in a suit for breach of contract. For that reason, both the Pennsylvania Superior Court and the Third Circuit, applying Pennsylvania law, have rejected the notion that when an employee provides an employer with personal information, an implied contract arises that obligates the employer to use reasonable measures to safeguard that information. *See Longenecker–Wells v. Benecard Servs. Inc.*, 658 F. App'x 659, 662 (3d Cir. 2016) ("[The employees] have failed to plead any facts supporting their contention that an implied contract arose between the parties other than that [the employer] required [the employees'] personal information as a prerequisite to employment. This requirement alone did not create a contractual promise to safeguard that information . . . ."); *Dittman v. UPMC*, 2017 WL 117652, at *5 (Pa. Super. Ct. Jan. 12, 2017).

Perhaps it could be said that an implied agreement arises on the part of the employer not to disclose that information to other people or use that information for non-business purposes, with the expectation that the employer would be held accountable if it does otherwise. *See Longenecker-Wells*, 2015 WL 5576753, at *7 (suggesting that an employer "might have . . . an implied contractual duty not to directly, or affirmatively, turn over [employees'] confidential information to third parties"). That common-sense understanding of the employer's duties would track the promises that Coca-Cola Enterprises made to its employees in the Code: it agreed to "collect[] only data related to the purpose for which the files were establishes" and ensure that "those authorized to use a file to do so only for legitimate Company purposes." But the "ordinary course of dealing and the common understanding of men" do not suggest that the company agreed to do anything further.

The fact that Coca-Cola had detailed information security policies that its employees were required to follow when handling company data does not alter the picture because, as explained, those rules clearly existed for the purpose of protecting the company from harm, not to inure to the employees' benefit. Even if an employee might be inclined to believe otherwise, the fact that the company unequivocally laid out the extent of its obligations in the Employee Records section of the Code—even if those terms did not have contractual effect—would dispel any notion that the company agreed to undertake an enforceable duty to do anything more.

Accordingly, judgment is warranted in Coca-Cola's favor on Enslin's breach of contract clams.[16] His motion for class certification is denied as moot.[17]

---

[16]      Enslin also raised a claim in restitution under the "opportunistic breach" theory, but with no contractual obligation on Coca-Cola's part, that claim fails. *See Enslin*, 136 F. Supp. 3d at 676 (explaining that this theory of restitution arises "when 'a deliberate breach of contract results in profit to the defaulting promisor and the available

## V.   Enslin's request for leave to amend is denied.

Enslin also seeks leave to amend to add claims under the Fair Labor Standards Act and the Pennsylvania Wage Payment and Collection Law. He bases these claims on the letter Coca-Cola sent him to notify him about the loss of the laptops and let him know that the company had arranged for him to receive a year of free credit monitoring and fraud restoration services in the event that any harm were to come from the lost laptops. In the letter, Coca-Cola also "recommend[ed] that [Enslin] remain vigilant for incidents of fraud and identity theft, including by regularly reviewing [his] account statements and monitoring [his] free credit reports," and pointed out that he has the ability to obtain free credit reports from nationwide credit reporting agencies if he wishes. Compl. Ex. A, ECF No. 1-2. Enslin contends that by advising him to take steps to ensure that his personal information remained secure, this letter—which he received seven years after he left the company—required him to do work for Coca-Cola for which he should be paid wages.

Enslin also seeks to reinstate a claim under the Driver's Privacy Protection Act of 1994. The Act places restrictions on the disclosure and use of personal information obtained from motor vehicle records; it was passed in 1994 after a series of high-profile incidents involving individuals who were stalked and killed by people who had obtained personal information about them from public motor vehicle records. *Pichler v. UNITE*, 542 F.3d 380, 400 (3d Cir. 2008) (Sloviter, J., dissenting). Under the Act, information obtained from motor vehicle records can be used only for certain purposes. *See* 18 U.S.C. § 2721(b). In his original complaint, Enslin claimed that by failing to prevent the rogue Coca-Cola employee from stealing laptops that contained his personal information—including his driver's license number—Coca-Cola had "knowingly disclosed" his personal information in violation of the Act. The Court rejected that argument. *See Enslin*, 136 F. Supp. 3d at 671. In the brief Enslin filed to oppose that motion, he urged the Court to also consider a separate theory: that the transfer of his personal information

---

damage remedy affords inadequate protection to the promisee's contractual entitlement" (quoting *In re 400 Walnut Assocs., L.P.*, 506 B.R. 645, 668 (Bankr. E.D. Pa. 2014))).

[17]    In his opposition to Coca-Cola's summary judgment motion, Enslin invoked Rule 56(d) to ask for additional time to conduct discovery. He contends that during discovery, Coca-Cola prevented him from having sufficient access to the recovered laptops and Coca-Cola facilities to conduct the kind of forensic investigation that Coca-Cola's expert conducted, who concluded that Coca-Cola took reasonable and industry-standard measures to safeguard its confidential information, including the personal information of its employees. Coca-Cola relied on that opinion to argue that even if it were under a contractual duty to safeguard Enslin's personal information, it did not breach that duty. Enslin also seeks additional time to conduct discovery into "union issues" in light of the § 301 preemption and exhaustion issues that Coca-Cola raised in its motion. Because neither of these subjects proved dispositive for Enslin, this request is moot. But even if it were not, his request would be denied. A party seeking to delay summary judgment to conduct further discovery must be able to explain "why [that discovery] has not been previously obtained," *see Shelton v. Bledsoe*, 775 F.3d 554, 568 (3d Cir. 2015), and Enslin offers no compelling answer. He complains that he was deprived of the ability to conduct his own forensic investigation of the laptops and Coca-Cola's security measures because of improper objections Coca-Cola raised during discovery, but Enslin never brought those objections to the Court during either fact discovery or expert discovery. As for the § 301 issues that Coca-Cola raised in its motion, Coca-Cola put Enslin on notice that it intended to raise this defense by including it in its answer, which was filed in October 2015, before discovery began. Enslin offers no explanation for why he could not pursue these issues during discovery.

from one Coca-Cola entity to another over the course of The Coca-Cola Company's efforts to consolidate its bottling operations were also "disclosures" of his information. In his view, those transfers violated the Act because once he left the company, Coca-Cola no longer had any legitimate use for his records, making each successive transfer of his records an improper disclosure. The Court declined to address this second theory because a fair reading of his complaint did not suggest that he had sought to raise it, and the Court pointed out that a "complaint may not be amended by the briefs in opposition to a motion to dismiss." *Id.* at 671-72. In his brief, Enslin asked that if the Court were unwilling to consider this second theory based on his original complaint, he be permitted the opportunity to amend his complaint to squarely raise this claim.[18] In light of that request, the Court dismissed his claim as pleaded in his complaint, but without prejudice.

Enslin's request to reinstate that claim now—and add claims under the FLSA and Pennsylvania WPCL—comes far too late. Fact discovery—on both the merits and on matters relevant to class certification—was completed in June 2016, and Enslin submitted his motion for class certification in July. Not until after he had already moved for class certification did Enslin seek leave to amend his complaint. While leave to amend should be "freely given," Fed. R. Civ. P. 15(a)(2), leave should not be granted "if a plaintiff's delay in seeking amendment is undue, motivated by bad faith, or prejudicial to the opposing party." *Cureton v. Nat'l Collegiate Athletic Ass'n*, 252 F.3d 267, 273 (3d Cir. 2001).

It is true that "delay alone is an insufficient ground to deny leave to amend," *id.* (quoting *Cornell & Co. v. Occupational Safety & Health Review Comm'n*, 573 F.2d 820, 823 (3d Cir. 1978)), but "at some point, the delay will become 'undue,' placing an unwarranted burden on the court, or will become prejudicial,' placing an unfair burden on the opposing party," *id.* (quoting *Adams v. Gould*, 739 F.2d 858, 863 (3d Cir. 1984)). That is the case here. The facts supporting each of the three claims that Enslin seeks to add were in his possession from the time he filed this case in 2014. His proposed FLSA and WPCL claims turn on the letter he received from Coca-Cola in early 2014, which formed the foundation for this suit and was attached to his original complaint. As for the reinstatement of his Driver's Privacy Protection Act claim, he stated in his brief at the pleadings stage—filed in February 2015—that he wished to amend his complaint to explicitly state his theory that the transfer of his information between the Coca-Cola entities violated the Act. *See id.* at 273 (observing that leave to amend may be denied if a plaintiff seeks to "replead[] facts that could have been pled earlier"). But instead of seeking leave to amend before—or even during—discovery, or before seeking class certification, Enslin waited. Allowing him to amend his complaint now raises the prospect of more discovery (into either the merits or issues related to class certification, since he wants to bring these three new claims on behalf of a class), as well as a new round of class certification proceedings, placing an

---

[18]     *See* Pl.'s Br. Opp'n 30 n.22, ECF No. 16 ("To the extent that the Court is unwilling to draw these reasonable inferences from the facts alleged, Plaintiff respectfully requests that he be allowed to file an Amended Class Action Complaint alleging further, specific additional facts concerning his claim under the DPPA.").

unwarranted burden on the Court—which already managed one contentious period of discovery[19]—as well as on Coca-Cola. This is all the more true in light of the fact that Enslin is seeking to reframe this case from a breach-of-contract action seeking damages for Coca-Cola's failure to safeguard his personal information, to an FLSA collective action coupled with a challenge to whether Coca-Cola's inter-affiliate recordkeeping practices comport with the Driver's Privacy Protect Act. Enslin's request for leave to amend his complaint is denied.[20]

## VI.    Conclusion

Summary judgment is warranted in Coca-Cola's favor on Enslin's breach of contract and unjust enrichment claims. His motion for class certification is therefore denied as moot, and his request for leave to amend his complaint is denied. An appropriate order follows.

---

[19]    *See, e.g.,* ECF No. 91; *see generally* ECF Nos. 59-120.

[20]    Even if his request was not untimely and prejudicial, leave to amend would be futile. As mentioned, the theory of his Driver's Privacy Protection Act claim is that once he left Coca-Cola, the company no longer had any legitimate need for his records, so the transfer of those records from one Coca-Cola entity to another during the course of various acquisitions and consolidations were "disclosures" of his information for a "purpose not permitted" by the Act. *See* 18 U.S.C. § 2427(a). But Enslin does not dispute that when Coca-Cola originally obtained his personal information, while he was still an active employee, Coca-Cola had a legitimate use for his information under the Act. In essence, his contention is that any further transfers of his information were not permitted under the Act because the company would no longer have any need to use his information for any of those legitimate reasons that it first collected it. He does not suggest that the company has or intends to make any *unpermitted* use of the information; he just contends that the company is unlikely to need to refer to it again in the future. But under the Act, a use of information is "not required to be immediate or certain." *Senne v. Vill. of Palatine,* 784 F.3d 444, 447 (7th Cir. 2015) (Posner, J.). A holder of information under the Act can retain that information, even if not in active use—and even if the information may never be used—as long as the reason that the information was collected and retained was not for an impermissible use under the Act. *Id.* (drawing an analogy to "a library [that] buys books to be used by being read, [even though] some library books are never read").

Enslin fares no better for his claim for unpaid wages under the FLSA. The fact that Coca-Cola recommended that he "remain vigilant for incidents of fraud and identity theft, including by regularly reviewing [his] account statements" and consider periodically obtaining a free credit report did not mean that time Enslin spent doing those things—seven years after he was last employed by the company—was "work for the employer's benefit." *See Mumbower v. Callicott,* 526 F.2d 1183, 1187-88 (8th Cir. 1975). Particularly in light of the conclusion that Coca-Cola did not breach any duty to him to safeguard his information (given that no duty was owed), Enslin cannot "demand that the employer pay him for self-appointed (and wholly self-interested) efforts." *See Debraska v. City of Milwaukee,* 189 F.3d 650, 652 (7th Cir. 1999) (Easterbrook, J.). The same is true under the Pennsylvania WPCL. The statute "does not create a right to compensation. Rather, it provides a statutory remedy when the employer breaches a contractual obligation to pay earned wages." *Weldon v. Kraft, Inc.,* 896 F.2d 793, 801 (3d Cir. 1990). The recommendations in the letter he received did not give rise to any contractual obligation on Coca-Cola's part to pay him any time he spent following those recommendations. The Court would also be remiss not to note that Coca-Cola went out of its way to avoid imposing a burden on the employees affected by the lost laptops by providing for a third-party vendor to monitor their credit for suspicious activity for them, for free.